

SEALED

UNITED STATES DISTICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.

DANIEL LIBURDI,
JOSEPH SCOTTO,
GREGORY WALKER, and
FRANK CARBONE III

Case No.  8:24cr564 -KKM -TGW

18 U.S.C. § 1349
(Bank Fraud Conspiracy)
18 U.S.C. § 1344
(Bank Fraud)
18 U.S.C. § 1956(h)
(Money Laundering Conspiracy)

**Filed Under Seal**

## INDICTMENT

The Grand Jury charges:

### COUNT ONE
### (Conspiracy to Commit Bank Fraud)

DEC 18 2024 PM4:26
FILED - USDC - FLMD - TPA

**A.    Relevant Parties and Entities**

At times material to the Indictment:

_**Individuals**_

1.    DANIEL LIBURDI was a citizen of the United States who resided within the Middle District of Florida.

2.    JOSEPH SCOTTO was a citizen of the United States who resided in Bay Shore, New York.

3.    GREGORY WALKER was a citizen of Canada who resided in Burlington, Ontario.

4.     FRANK CARBONE III was a citizen of the United States who resided within the Middle District of Florida.

5.     Morris Goldstein was a citizen of the United States who resided within the Middle District of Florida.

6.     S.I. was a citizen of the United States who resided within the Middle District of Florida.

### *Business Entities*

7.     International Click Exchange LLC ("ICE") was a Delaware entity organized in or around December 2018, owned, controlled, and directed by SCOTTO and WALKER. ICE engaged in the business of facilitating the creation and publication of online advertisements and directing of internet traffic to websites and online payment portals.

8.     Green Brick Media LLC ("Green Brick") was a Wyoming entity organized in or around April 2016, owned, controlled, and directed by LIBURDI, which served as a business management entity.

9.     Swipe Wyre Media LLC ("Swipe Wyre") was a Wyoming entity organized in or around February 2021, headquartered in the Middle District of Florida, owned, controlled, and directed by LIBURDI and CARBONE III, which conducted merchant processing and served as a business management entity.

10.    West Town Bank & Trust was a federally insured financial institution headquartered in North Riverside, Illinois, that served as an "Acquiring Bank" for merchant accounts, and whose deposits were insured by the FDIC.

2

11.    West Town Payments, LLC was a North Carolina registered business entity that served as an "Independent Sales Organization" or agent for businesses seeking merchant accounts on behalf of West Town Bank & Trust.

12.    Fifth Third Bank, N.A. was a federally chartered financial institution headquartered in Cincinnati, Ohio, that served as an "Acquiring Bank" for merchant accounts, and whose deposits were insured by the FDIC.

13.    Payroc, LLC was an Illinois registered business entity that served as an "Independent Sales Organization" or agent for businesses seeking merchant accounts on behalf of Fifth Third Bank, N.A.

14.    Quick Body Nutra, LLC, was a business entity registered in the State of Wyoming and headquartered in the Middle District of Florida, owned and controlled by LIBURDI, which conducted merchant processing activities.

**B.    Relevant Terms & Concepts**

***Terminology***

15.    An "Independent Business Owner" ("IBO") was a term utilized by the conspirators to describe an individual recruited to provide personally identifiable information ("PII"), such as name, social security number, date of birth, address, and other information in return for compensation.

16.    An "Acquiring Bank" was a federally insured or chartered financial institution located within the United States which was involved in the provisioning of financial accounts for merchants and other commercial entities and served as a responsible entity in the processing of credit card and debit card transactions.

17.     An "Independent Sales Organization" ("ISO") was a business entity that had a contractual relationship with an Acquiring Bank to serve as its agent for the purpose of managing relationships with merchants and commercial entities that had a merchant account with the Acquiring Bank.

18.     A "merchant account" was a type of financial institution account provided by an Acquiring Bank that provided a way for merchants and commercial entities to accept debit and credit card payments, either in-person or online. Merchants could obtain merchant accounts by completing an application with an ISO acting as an agent for an Acquiring Bank.

19.     "High-risk merchants" were a class of merchants who, from the perspective of Acquiring Banks and/or their ISO(s), represented a higher-than-normal risk that their customers would dispute their charges ("chargebacks") or otherwise seek a refund, potentially resulting in a financial loss to the Acquiring Bank. Merchants who engaged in "negative option marketing" or "card rebilling" sales models were typically included in this class of merchants.

20.     "Negative option marketing" referred broadly to a category of sales techniques in which sellers interpreted a customer's failure to take an affirmative action, such as rejecting an offer, or failing to cancel during a trial period, as an assent by the customer to be further charged for goods or services. These additional charges often occurred without explicit knowledge or notification to the customer.

21.     "Card Rebilling" referred broadly to a category of sales techniques where a seller periodically charged a customer's card, with or without providing

4

additional goods or services. This rebilling often occurred without notice to the customer and the customer often lacked initial knowledge that their card would be subsequently charged.

22.     "Mastercard Alert to Control High-Risk [Merchants]" or "MATCH" list, was a database maintained by Mastercard Inc., and available to Acquiring Banks, ISO(s), and others within the card payment industry, which identified and flagged merchants and individuals who had been determined by one or more financial institutions to be an unacceptably high-risk, associated with fraud, or otherwise ineligible to continue a payment processing relationship with. Placement of a merchant or individual on the MATCH list was highly likely to impact their ability to obtain merchant processing services from other financial institutions in the future.

### *Card Payment Networks*

23.     Within the United States, acceptance of a credit or debit card by a merchant at a point-of-sale or over the internet required the merchant to have a merchant account through an Acquiring Bank.

24.     Acquiring Banks had contractual agreements with card payment networks, such as "VISA" and "Mastercard," and were held by the card payment network as the responsible party when a charge was disputed, cancelled, or otherwise refunded. In turn, Acquiring Banks had agreements with their merchants to be made whole or indemnified by the merchant when a chargeback resulted in a loss to the Acquiring Bank.

25.    Generally, merchant accounts were established by a merchant preparing
and submitting an application to an Acquiring Bank through an ISO. The application
contained statements of fact about the merchant, such as a listing of the owners of
the business, the nature of products sold, and the modality of the sales (e.g. online, or
from a storefront). Applications were signed by the principal owners of the business.
Acquiring Banks relied on truthful information being conveyed from the merchant
about the nature of their business, so that the ISO/Acquiring Bank could assess the
risk of a particular merchant in deciding to provide a merchant account.

26.    Merchants who engaged in high-risk practices, such as negative option
marketing or card rebilling sales, and who, as a result, obtained a high number of
chargebacks or refunds obligating the Acquiring Bank, were at risk of having their
merchant accounts terminated. Merchants who had their accounts terminated for
this reason may have been reported by the ISO or Acquiring Bank for inclusion on
the MATCH list, resulting in adverse consequences for the merchant.

## C.    Overview of Conspiracy

27.    LIBURDI and Goldstein devised a scheme intended to allow them to
conduct high-risk merchant transactions, such as negative option marketing and/or
card rebilling, while insulating themselves from the personal liabilities and risks
associated with being high-risk merchants, by fraudulently establishing merchant
accounts for entities they controlled in the name of IBOs, including CARBONE III,
by false pretenses to Acquiring Banks. SCOTTO and WALKER, with knowledge of
LIBURDI and Goldstein's fraudulent representations to the financial institutions,

6

accepted proceeds stemming from LIBURDI and Goldstein's activities to facilitate the production of internet advertising intended to bring new customers.

## D.    The Conspiracy

28.    Beginning on an unknown date, but from at least in or around May 23, 2018, and continuing through to in or around May 8, 2023, in the Middle District of Florida and elsewhere, the defendants,

**DANIEL LIBURDI,
JOSEPH SCOTTO,
GREGORY WALKER, and
FRANK CARBONE III,**

did knowingly and voluntarily combine, conspire, confederate, and agree with others, both known and unknown to the Grand Jury, to execute and attempt to execute a scheme or artifice to defraud a financial institution, in violation of 18 U.S.C. § 1344.

## E.    Manner and Means of the Conspiracy

29.    The manner and means by which the defendants and their coconspirators sought to accomplish the object of the conspiracy included, among others, the following:

a.    It was a part of the conspiracy that conspirators, and others would and did recruit IBO(s) under false pretenses, for purposes of obtaining and using their PII;

b.     It was a further part of the conspiracy that conspirators and others would and did use the PII of the IBO(s) to create and cause to be created various shell companies;

c.     It was a further part of the conspiracy that conspirators and others would and did take steps, and direct others to take steps, to make the shell companies appear legitimate, including by establishing email addresses and product sale websites for the shell companies, obtaining Employer Identification Numbers for the shell companies, and opening and causing to be opened business bank accounts in the names of the shell companies;

d.     It was a further part of the conspiracy that conspirators and others would and did apply for merchant accounts with Acquiring Bank(s) through ISO(s) in the name of shell companies for the purpose of engaging in high-risk sales practices;

e.     It was a further part of the conspiracy that, to induce Acquiring Bank(s) and their ISO(s) to open merchant accounts in the shell companies' names, the conspirators would and did prepare and submit, and cause to be prepared and submitted, merchant account applications that included false and fraudulent representations and pretenses, such as:

i.     hiding the business affiliation of the shell company with the conspirators and entities owned, controlled, and directed by the conspirators;

ii.     misrepresenting the beneficial ownership information of the shell company to hide the control and benefit of the conspirators;

8

    iii.  stating there were no other currently/previously owned businesses associated with the purported IBO applicant; and

    iv.  falsely affirming the truth of the statements in the application;

    f.  It was a further part of the conspiracy that the conspirators would and did direct others to develop fake website pages ("bank pages") which were provided to the Acquiring Bank(s) and contained false and fraudulent representations;

    g.  It was a further part of the conspiracy that conspirators, in concert with others, would and did impersonate IBO(s) during verification phone calls from Acquiring Banks with the intent to provide misleading, false, and fraudulent information;

    h.  It was a further part of the conspiracy that LIBURDI and others would and did use obtained merchant accounts to process credit and/or debit card transactions purportedly relating to the sale of products for customers;

    i.  It was a further part of the conspiracy that conspirators would and did facilitate the publication of advertisements on the Internet related to these products and directed internet traffic to the online payment portals established by conspirators and others to encourage further sales, while knowing that these companies were fraudulently obtained shell companies;

j.      It was a further part of the conspiracy that conspirators would and did use the online banking access privileges associated with the shell companies' business bank accounts to make and monitor deposits and withdrawals;

k.      It was further part of the conspiracy that the conspirators would and did misrepresent, hide, and conceal, and cause to be misrepresented, hidden, and concealed, the purpose of acts performed in furtherance of the conspiracy.

All in violation of 18 U.S.C. § 1349.

## COUNT TWO
### (Bank Fraud)

**A.      Introduction**

30.     The allegations contained in paragraphs 1 through 26 are realleged and incorporated here.

**B.      The Scheme and Artifice**

31.     Beginning at least as early as in or about April 26, 2022, and continuing through on or about May 8, 2023, in the Middle District of Florida, and elsewhere, defendants,

**DANIEL LIBURDI and
FRANK CARBONE III,**

did knowingly, and with intent to defraud, execute, and attempt to execute, a scheme and artifice to defraud one or more financial institutions, which scheme and artifice employed material falsehoods and omissions, and to knowingly, and with intent to defraud, execute and attempt to execute, a scheme and artifice to obtain moneys,

10

funds, credits, assets, and other property owned by, and under the custody and control of one or more financial institutions, by means of false and fraudulent pretenses, representations, promises and omissions relating to a material fact.

**C.    Manner and Means of the Scheme and Artifice**

32.    The allegations contained in paragraph 29 are realleged and incorporated here.

**D.    Execution of the Scheme**

33.    On or about April 26, 2022, the defendants,

**DANIEL LIBURDI and
FRANK CARBONE III,**

knowingly and intentionally executed and attempted to execute and aided and abetted in the execution and attempted execution of the aforesaid scheme and artifice, by submitting an application on behalf of Swipe Wyre containing materially false representations to West Town Payments LLC, to obtain a merchant account provided by West Town Bank and Trust.

All in violation of 18 U.S.C. §§ 1344 and 2.

**COUNT THREE**
**(Bank Fraud)**

**A.    Introduction**

34.    The allegations contained in paragraphs 1 through 26 are realleged and incorporated here.

**B.    The Scheme and Artifice**

35.    Beginning on or about October 11, 2019, and continuing through at least January 2022, in the Middle District of Florida, and elsewhere, defendant,

**DANIEL LIBURDI,**

did knowingly, and with intent to defraud, execute, and attempt to execute, a scheme and artifice to defraud one or more financial institutions, which scheme and artifice employed material falsehoods and omissions, and to knowingly, and with intent to defraud, execute and attempt to execute, a scheme and artifice to obtain moneys, funds, credits, assets, and other property owned by, and under the custody and control of one or more financial institutions, by means of false and fraudulent pretenses, representations, promises and omissions relating to a material fact.

**C.    Manner and Means of the Scheme and Artifice**

36.    The allegations contained in paragraph 29 are realleged and incorporated here.

**D.    Execution of the Scheme**

37.    On or about October 11, 2019, the defendant,

**DANIEL LIBURDI,**

knowingly and intentionally executed and attempted to execute the aforesaid scheme and artifice, by submitting an application on behalf of Quick Body Nutra, LLC containing materially false representations to Payroc, LLC, to obtain a merchant account provided by Fifth Third Bank, N.A.

12

All in violation of 18 U.S.C. §§ 1344 and 2.

## COUNT FOUR
### (Money Laundering Conspiracy)

**A.    Introduction**

38.    Persons and entities listed in Part A of Count One, encompassing

paragraphs 1 through 9, are realleged and incorporated here.

**B.    The Conspiracy**

39.    From in or about December 14, 2021, and continuing through at least

August 27, 2024, within the Middle District of Florida, and elsewhere,

**DANIEL LIBURDI,
JOSEPH SCOTTO,
GREGORY WALKER, and
FRANK CARBONE III,**

did willingly and knowingly combine, conspire, confederate, and agree with one

another and with others, both known and unknown to the Grand Jury, to conduct

and attempt to conduct financial transactions, affecting interstate commerce, which

transactions involved the proceeds of specified unlawful activity, that is, bank fraud

(18 U.S.C. § 1344), knowing that the property involved in the financial transactions

represented the proceeds of some form of unlawful activity, and further knowing that

the transactions were designed in whole or in part with the intent to promote the

carrying on of such specified unlawful activity, in violation of 18 U.S.C. §

1956(a)(1)(A).

## C.    Manner and Means of the Money Laundering Conspiracy

40.    The manner and means by which the defendants and their coconspirators sought to accomplish the objects of the conspiracy included, among others, the following:

a.    It was part of the conspiracy that conspirators would and did receive proceeds of a specified unlawful activity, specifically bank fraud, through fraudulently obtained merchant accounts maintained at federally insured financial institutions in the Middle District of Florida and elsewhere;

b.    It was a further part of the conspiracy that conspirators did conduct financial transactions, moving these unlawful proceeds from the merchant processing accounts into accounts controlled by one or more of the conspirators in the Middle District of Florida and elsewhere;

c.    It was a further part of the conspiracy that conspirators conducted transactions in the Middle District of Florida and elsewhere, using proceeds of specified unlawful activity, specifically, bank fraud, to pay for services in promotion of the bank fraud scheme, such as the placement of internet advertisements intended to bring customers to websites controlled by the conspirators and others for purposes of obtaining additional proceeds from the sale of goods, processed through the fraudulent merchant accounts.

All in violation of 18 U.S.C. § 1956(h).

14

## FORFEITURE

1.      The allegations contained in Counts One through Four are incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. §§ 982(a)(1), and 18 U.S.C. § 982(a)(2)(A).

2.      Upon conviction of a violation of 18 U.S.C. § 1344, and/or a conspiracy to violate section 1344 (18 U.S.C. § 1349), the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violation.

3.      Upon conviction of a conspiracy to violate 18 U.S.C. § 1956, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense, and any property traceable to such property.

4.      The property to be forfeited includes, but is not limited to, an order of forfeiture in the amount of at least $128,144,908.66, which represents the total proceeds obtained from, and amount involved in, the offenses, as well as the following assets which were purchased with proceeds of, and involved in, the offenses:

      a.      the real property located at 195 Chocolate Hole, USVI, parcel number 3-08203-0603-00, including all improvements thereon and appurtenances thereto;

      b.      the real property located at 269 N. Hibiscus Dr., Miami Beach, Florida 33139, Tax ID: 02-3232-006-0445, including all improvements thereon and appurtenances thereto;

c.     the real property located at 101 N. Hibiscus Dr., Miami Beach, Florida 33139, Tax ID: 02-3232-006-0550, including all improvements thereon and appurtenances thereto; and

d.     the real property located at 205 N. Hibiscus Dr., Miami Beach, Florida 33139, Tax ID: 02-3232-006-0480, including all improvements thereon and appurtenances thereto.

5.     If any of the property described above, as a result of any act or omission of the defendant:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property under the

provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).


A TRUE BILL



Foreperson


ROGER B. HANDBERG
United States Attorney


By: _____
Adam J. Duso
Assistant United States Attorney


By: _____
Carlton C. Gammons
Assistant United States Attorney
Chief, Economic Crimes Section


17

FORM OBD-34
December 24

No.

## UNITED STATES DISTRICT COURT
### Middle District of Florida
### Tampa Division

## THE UNITED STATES OF AMERICA

vs.
DANIEL LIBURDI,
JOSEPH SCOTTO,
GREGORY WALKER, and
FRANK CARBONE III

## INDICTMENT

Violations: 18 U.S.C. §§ 1349, 1344, and 1956(h)

A true bill.

_____

Foreperson

Filed in open court this 18ᵗʰ day

of December 2024.

_____
Clerk

Bail $_____